Harry LEWIS et al., Plaintiffs,

v.

TELEPROMPTER CORP. et al., Defendants.

Nos. 73 Civ. 3929, 73 Civ. 4109, 73 Civ. 4133, 73 Civ. 4895, 74 Civ. 3025, 74 Civ. 3281, 74 Civ. 4341 and 75 Civ. 1815 (VLB).

United States District Court, S. D. New York.

Aug. 15, 1980.

Pomerantz, Levy, Haudek & Block, New York City, for plaintiff Philip Heller, et al.

Kaufman, Taylor, Kimmel & Miller, New York City, for plaintiff Stephen Bush.

Gainsburg, Gottlieb, Levitan & Cole, New York City, co–counsel for plaintiff Radzanower.

Samuel Weinstein, New York City, for plaintiff Leon Brill.

Sachnoff, Schrager, Jones, Weaver & Rubenstein, Ltd., Chicago, Ill., Jerrold M. Shapiro, Chicago, Ill., Shea, Gould, Climenko & Kramer, New York City, for defendant Teleprompter Corp.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for defendant Touche Ross & Co.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Cooke, Bresnan, Wrather, Safer, Lewis, Lowe, Livingston, Adams, Luckman, Mitchel and Simon.

Anderson & Goldman, New York City, for defendant J. R. Barrington.

Holtzman, Wise & Shepard, New York City, for defendant Marvin Carton.

Katz, Leavy, Rosenweig & Sindle, New York City, for defendant Leonard Tow.

Hall, Dickler, Lawler, Kent & Howley, New York City, for defendant Hubert J. Schlafly.

Milbank, Tweed, Hadley & McCloy, New York City, for defendants Puckett and Richardson.

Wolf, Popper, Ross, Wolf & Jones, New York City, lead counsel for plaintiffs.

Ira Jay Sands, New York City, for plaintiff Radzanower.

Bader & Bader, White Plains, N. Y., for plaintiff Independent Investor Protective League, et al.

OPINION

VINCENT L. BRODERICK, District Judge.

In connection with the settlement of this consolidated shareholder class action lead counsel has made an application for attorney's fees on behalf of itself and two other firms of attorneys, and has opposed the application for attorney's fees filed by attorneys representing other plaintiffs.[1]

---

1. This opinion contains my findings of fact and conclusions of law with respect to the application for attorney's fees.

**14**

## I.

Attorneys for plaintiffs in class actions, who have been characterized as private attorneys general, perform an important function in the application and enforcement of various laws for the protection of the public interest. It is probable that the various laws which are implicated in actions brought by such attorneys would be less effective without their efforts. Nor do the actions they bring provide a true measure of their contributions: thus the possibility—or the threat, depending upon one's perspective—that in the securities field such private attorneys general are keeping tabs on the activities of public companies undoubtedly plays its role in encouraging those active in the corporate community to a greater awareness of their legal and fiduciary responsibilities.

The role of the members of the plaintiffs' bar in the enforcement of the securities laws through private action is particularly important. One who is injured, or threatened by injury, when corporate officers and directors through negligence or otherwise fail in the discharge of their legal and fiduciary responsibilities generally has too little an individual stake to take preventive or compensating action. Through the class action the private attorney general, nominally representing one or more individual plaintiffs with a relatively minor stake, can effectively challenge such conduct. Whatever the knowledge, and the means, and the doggedness of the individual plaintiff, effective court challenges to alleged securities law misfeasance or malfeasance rarely get off the ground unless a class is certified and the action is pursued in the interest of the class.[2] It is class actions, with the possibility of substantial recoveries on behalf of the class, which draw so many talented attorneys to this field of litigation as plaintiffs' counsel. Defendants in such actions are perforce required to balance the equation by retaining the finest and most able of law firms to defend against such suits.

The very nature of class actions implies a different relationship between plaintiffs and plaintiffs' counsel than obtains in non-class action litigation. Once the class is certified there is no longer merely one or a few plaintiffs—the members of the class are the plaintiffs, and they may number in the hundreds or thousands. The plaintiffs' attorney effectively controls the litigation, since there is no plaintiff in normal course who has sufficient stake to maintain day-to-day contact with its progress. While Rule 23 as interpreted by the courts requires, as a condition to class certification, that the named plaintiff in such litigation have sufficient knowledge, interest, and means that the court is persuaded that the litigation will effectively be pursued in the interest of the class, as a practical matter this emphasis upon the responsibility of the named plaintiff is a legal fiction. The effectiveness of the prosecution of class action litigation is a function of the ability of plaintiffs' counsel.

Thus in the context of class action litigation implicating the provisions of the securities laws, to the extent that plaintiffs' counsel has the necessary talents to investigate corporate and securities machinations, using to good effect the various discovery tools available under the Federal Rules, the court can have confidence that the litigation will be effectively pursued. Where there is such representation, day-to-day judicial supervision, rarely possible, is not required. To the extent that plaintiffs' counsel lacks experience or ability or both, continuing oversight by the court is indicated. Since, important as it is, class action litigation represents only a relatively small percentage of the total caseload handled by every judge, and since day-to-day supervision by the judge of the progress of class actions would be inconsistent with the allocation of appropriate attention to the other parts of his calendar, the judge attempts to minimize his own involvement in the day-to-

---

**2.** The derivative action, which does not require certification of a class, is less frequently employed by private attorneys general to enforce the provisions of the securities laws. One of the actions consolidated herein, *Bush* (74 Civ. 3281), combined representative claims on behalf of a class and a derivative claim.

day progress of class action cases through the discovery stages by assuring himself that the litigation is in the hands of plaintiffs' counsel in whose ability he has confidence.

■ Because members of a shareholder class have little influence over their lawyer in a class action, and because the judge by necessity puts such a high degree of trust and confidence in him or her, the plaintiffs' counsel in shareholder class action litigation has special obligations running to both. This case entails failure to acquit those obligations.

## II.

In the years 1973–1975 eight shareholder class actions were commenced in or transferred to this court[3] which stemmed from activities involving Teleprompter Corporation ("Teleprompter") in 1973 and 1974. In addition, in 1974 the Securities and Exchange Commission ("SEC") brought an injunction action against Teleprompter, which was promptly disposed of by consent judgment. Some of the later–filed complaints in the eight class actions were modeled on earlier ones that had been filed; others were patterned, with minor modifications and other defendants added, on the SEC complaint. The defendants sought consolidation. At a hearing on October 4, 1974 Judge Lloyd F. MacMahon consolidated the seven actions then pending for all purposes (except that the derivative count of one of the actions was consolidated for pre–trial purposes only).[4] At the same time, Judge MacMahon appointed the law firm of Wolf Popper Ross Wolf & Jones ("Wolf Popper") as lead counsel and charged that firm with the direction and control of the litigation on behalf of all plaintiffs. Two other highly regarded plaintiffs' counsel, Pomerantz, Levy, Haudek & Block, and Kaufman, Taylor, Kimmel & Miller, who represented plaintiffs in various of the cases that were consolidated, supported the appointment of

Wolf Popper as lead counsel. The consolidation and the appointment of Wolf Popper as lead counsel were memorialized by Judge MacMahon in an order filed November 19, 1974. The order, *inter alia*, provided that other plaintiffs' counsel were to be given notice of, and could attend, all depositions, and could suggest additional questions to be propounded, in its discretion, by lead counsel. It also provided that each of the plaintiffs in the actions which were consolidated was to "bear a proportionate share of all costs, expenses and disbursements hereafter incurred by lead counsel in the consolidated action."[5]

Judge MacMahon's selection of the Wolf Popper firm as lead counsel obviously reflected his confidence that that firm, which has had long experience as plaintiffs' counsel in shareholders' representative actions, would resolutely pursue this litigation.

So far as its ability resolutely to pursue the litigation was concerned, Judge MacMahon's confidence in the Wolf Popper firm was not misplaced. After extensive discovery and extended settlement negotiations, the Wolf Popper firm negotiated a proposed settlement with the defendants which will provide a fund of $2,725,000 which, less counsel fees, will be available for payment to members of the class in three installments over a 2–year period. It was stipulated in the proposed settlement that application by plaintiffs' counsel for attorney's fees would not exceed $600,000 and that the expenses of notice and administration of the settlement will be borne by the defendants. After notice to the class and to the shareholders of Teleprompter, I approved this settlement at a hearing.

## III.

I now have before me Wolf Popper's application for counsel fees, on behalf of itself, the Pomerantz firm, and the Kaufman firm in the amount of $600,000, plus ex-

---

3. Seven shareholder actions were filed in the Southern District of New York. One such action was filed in the Northern District of Illinois in 1974 and transferred to this district in 1975.

4. The eighth action was consolidated with the other actions in 1976.

5. Order of consolidation filed November 19, 1974.

penses of $12,971.72. The counsel for various of the other actions which have been consolidated have also applied for counsel fees, and Wolf Popper opposes these applications, but takes the position that, to the extent any of them is granted, its application will be reduced so that the total amount of counsel fees paid to plaintiffs' counsel in the consolidated actions will not exceed $600,000.

In the course of the settlement hearing and the hearing on the fee applications, there was a useful delineation of various considerations which come into play in considering a fee application. In shareholder class action litigation the representation is generally undertaken on a contingent basis. While the plaintiffs' bar in such litigation has considerable experience and can sift out many of the non–meritorious causes without bringing suit, many actions are brought in which it is determined, in the course of discovery, that the apparent merit of the action is illusory. While relatively few shareholder actions are actually tried, some run the full course and are lost by the plaintiffs at the trial level, or with victory on trial some are reversed on appeal. Thus the contingencies are real: some shareholder class actions brought on a contingent basis are not won or settled, and with respect to such cases no attorney's fees are ultimately awarded.

Even where a satisfactory settlement is achieved, or the plaintiffs finally prevail after trial and appeal, there are other risks: it may develop that the recovery does not come up to expectations, or that the defendants are not able to pay attorney's fees which are in fact awarded.

There are also those risks which are economic rather than litigative. Even in those cases where fee awards are made after trial or, more often, after settlement, the fee awarded covers services rendered over an extended period of time during which plaintiffs' counsel have not had the use of the money and during which inflation has reduced the value of the dollars in which plaintiffs' attorney's fees are ultimately paid.

In sum, there is every reason for the court, in evaluating services rendered by and in determining the fees to be paid to successful plaintiffs' counsel in shareholder class actions, to recognize the various risks entailed.

At this stage of a shareholder's class action–where the settlement has been approved and the appropriate attorney's fees and their allocation must be determined–there is for all practical purposes no one in a position to assist the judge. The class members (and in this particular case the shareholders of Teleprompter, whether or not they are members of the class) have received notice of the amount of counsel fees to be applied for, but that notice has been coupled with notice that there will be a large distribution to class members, which will be reduced only fractionally by the counsel fees applied for. The defendants have already agreed to the settlement, and the amount of that settlement to be allocated to counsel fees is presumably a matter to which they are indifferent. The plaintiffs' attorneys, who have been pursuing the litigation on a contingent basis, are presumably interested in maximizing the fee to be awarded by emphasis upon the difficulties faced, the results accomplished, and their contributions to those results. It is, at least in my experience, the rare situation where meaningful questions with respect to the propriety of fee awards are raised by anyone other than the judge himself.

Such questions have been raised here. Lead counsel has opposed fee awards to various other counsel, recognizing that to the extent such awards are made its own share will be reduced. Other counsel have drawn to my attention certain theretofore undisclosed threshold fee–splitting agreements between lead counsel and certain other plaintiffs' counsel on whose behalf lead counsel also applies for fees, and theretofore undisclosed threshold agreements, later modified, made by lead counsel to pay substantial portions of the fee award to attorneys whose clients lead counsel has represented in this litigation, where the major contributions of those attorneys have

been to furnish the clients. These agreements require attention.

The applications before me suggest two basic questions which must be considered with respect to the applications for fee awards.

1) Is it appropriate for a judge, in awarding counsel fees, to respect advance agreements made between certain counsel for the division of those fees, where those agreements were concealed from the court and not disclosed until consideration of the applications for fee awards was well under way, and where there is no correlation between the services rendered by a particular attorney and the portion of the fees to be allocated to that attorney?

2) Is it appropriate to award fees in tag–along actions–representative lawsuits brought with different named plaintiffs which substantially track actions previously brought?

In considering these questions, I bear in mind that the fees to be paid to plaintiffs' counsel will be paid in large measure from funds which would otherwise go to the members of the class, most of whom have not had, throughout the course of the litigation, any contact with, or control over, any of the attorneys involved. I also bear in mind that the fund which has been created would not exist if it had not been for the efforts of plaintiffs' counsel, or at least some of plaintiffs' counsel.

We deal here with class members' money. To the extent that a part of a fee award goes to an attorney who has rendered no service, to that extent the fee award is too high and is unreasonable. Even if an attorney has rendered some service, to the extent that a part of the fee award goes to that attorney which exceeds the reasonable value of his services, the fee award is too high and is unreasonable.

Wolf Popper some years ago determined by agreements with other attorneys upon percentage allocations of portions of the fee to be awarded.[6] These agreements were never disclosed to the court for consideration or approval, or even as a matter of information. The notice of proposed settlement which went to class members (and to shareholders of Teleprompter) made no reference to these agreements. The allocations predicated upon those agreements bear no relationship to the contributions made or not made by the attorneys to be benefitted.

Thus Wolf Popper seeks a fee award of $600,000 not only for its own services, but for the services of two other law firms, the Pomerantz firm and the Kaufman firm, which brought actions which were consolidated herein. In addition, Wolf Popper has agreed with two attorneys who referred clients to Wolf Popper that they are to have a substantial percentage interest in whatever is awarded to Wolf Popper.

If a fee award of $600,000 were in fact made in this case, it would be distributed as follows:

| | |
|---|---|
| 1) The Pomerantz firm would receive 15%, or | $ 90,000 |
| 2) The Kaufman firm would receive 8–½%, or | 51,000 |
| 3) Abraham I. Markowitz, an attorney who referred Harry Lewis, plaintiff in 73 Civ. 3929, to Wolf Popper would receive 10% of the amount remaining after the Pomerantz and Kaufman shares are taken out, or | 45,900 |
| 4) David Greenfield, an attorney who represented Harry Sigafoos, an additional plaintiff in 73 Civ. 4109, would receive 10% of the amount remaining after the Pomerantz and Kaufman shares are taken out, or | 45,900 |
| 5) The Wolf Popper firm would receive the balance, or | 367,200 |
| | $600,000 |

6. The agreement with the Pomerantz firm was made in October, 1974, immediately before a hearing on consolidation. The agreement with the Kaufman firm was made shortly thereafter. The agreements with the referral attorneys were made at the time of the referrals, which occurred in 1973 and 1974: the latter agreements were amended in 1978 to reduce the referring attorneys' percentage in light of the participation by the Pomerantz and Kaufman firms.

Wolf Popper has argued that it should be a matter of indifference to the court how the pie is sliced, if the fee requested is on its face a reasonable one, and if the results accomplished warrant its award. It suggests that it is routine for the court simply to fix the amount of the fee, and then to leave it to the various plaintiffs' attorneys involved to decide for themselves how the fee is to be allocated—that, in fact, it is a service to the court not to burden it with the nuts and bolts of determining distribution. While I appreciate Wolf Popper's solicitude, I reject its argument. Wolf Popper has overlooked two important obligations which are part and parcel of its role as plaintiffs' counsel: the duty of its members and associates as officers of the court to be sure that the court, in passing on its fee application, has all the facts; and its fiduciary duty to the shareholder class not to overreach.

I proceed to an analysis of the contributions, if any, made by all attorneys who are applying through Wolf Popper for fees, and to a determination of their entitlement, or lack of entitlement, to fee awards, and the amount thereof, if any.

### A.

I deal first with the three firms named in the application—Wolf Popper, Pomerantz and Kaufman.

*Wolf Popper.* Wolf Popper has, as set forth above, applied for a global award of $600,000 to be made to it, the Pomerantz firm and the Kaufman firm, with 20 percent of Wolf Popper's share to go to forwarding attorneys. $367,200 is the portion of the proposed total fee award that Wolf Popper seeks for itself.

It was emphasized to me, in connection with Wolf Popper's fee application on behalf of itself and the Pomerantz and Kaufman firms, that all those firms sought to minimize fees by having the legal work done at the most economical level possible— i. e., by associates rather than by partners, or by partners commanding lower fees rather than by senior partners, and that in the post–consolidation phase all three firms sought to minimize fees by not duplicating each other's work.

Wolf Popper brought considerable experience to the task of lead counsel. The ground had not been broken with respect to the matters complained of—i. e., when the first complaint against Teleprompter (*Lewis* (73 Civ. 3929)) was filed by Wolf Popper on September 13, 1973 there had been no SEC proceeding or action involving the same subject matter which chartered a course to follow.[7] While relatively little had been done by Wolf Popper (or any other plaintiffs' counsel) in this matter prior to consolidation,[8] thereafter Wolf Popper as lead counsel filed a consolidated complaint; conducted extensive discovery; successfully moved for class certification; negotiated for a settlement payment of $2,725,000 to the members of the class, to be paid in three installments, in a situation where the maximum potential recovery was approximately $5 million and the litigation risks were considerable; and prepared the settlement papers. This, like most similar shareholder class actions, was handled on a contingent basis and the Wolf Popper firm devoted some 2,536 hours of partners' and associates' time to the matter, exclusive of the application for attorney's fees. Almost seven years have passed during which the

---

7. An SEC injunction action against Teleprompter was brought in this court on July 15, 1974 (74 Civ. 3003), but it was speedily terminated by consent judgment. It did furnish a substantial basis for the complaints in various later–filed actions consolidated herein (74 Civ. 3025, 74 Civ. 3281, 74 Civ. 4341, and 75 Civ. 1815), and was liberally borrowed from in the amended complaint filed by Wolf Popper in 73 Civ. 4109 and that filed by the Pomerantz firm in 73 Civ. 4895.

8. Wolf Popper filed a second complaint on behalf of a different plaintiff on September 26, 1973 (73 Civ. 4109), which tracked its original complaint, and an amended complaint in the second action on August 6, 1974, which borrowed extensively from the complaint in the 1974 SEC action against Teleprompter. (*See* fn. 7, *supra*).

firm has not been paid for its services. On the basis of Wolf Popper's normal current hourly time charges the fees for its services herein would have been $290,020.[9]

*Pomerantz.* The *Heller* action (73 Civ. 4895), in which the Pomerantz firm was counsel for plaintiffs, was filed on November 14, 1973, some two months after the *Lewis* action (73 Civ. 3929) and one and one–half months after the *Turek* action (73 Civ. 4109), both brought by Wolf Popper. The *Heller* complaint substantially tracks the complaints filed by Wolf Popper. It names more defendants (the Wolf Popper actions had named only Teleprompter as defendant), and the allegations of wrongful conduct are somewhat more detailed than those contained in the Wolf Popper actions. The *Heller* complaint was amended August 2, 1974, and the amendment to a considerable extent borrowed from the complaint in the SEC injunction action which had been filed on July 15, 1974.

The Pomerantz firm devoted a total of 134½ hours to the Teleprompter litigation; 35½ hours to pleadings, and matters in connection therewith; 28¾ hours to the motion in support of class certification; 30¾ hours to interrogatories, requests for documents and examination of documents; 22½ hours to consultation with the Wolf Popper firm after consolidation; and 17 hours in the settlement phase of the case.

Very shortly before the consolidation hearing before Judge MacMahon in 1974, Abraham Pomerantz agreed that the Pomerantz firm would support Wolf Popper's application to be appointed lead counsel at the consolidation hearing, and Philip Jones of Wolf Popper agreed that the Pomerantz firm would receive 15% of any fee awarded in connection with the consolidated litigation. It is obvious, and I find, that the fee agreement was directly related to Pomerantz' support of Wolf Popper's application to be lead counsel. The fee agreement was not made known to Judge MacMahon at the time of consolidation, and in fact did not become known to the court until the hearings before me on attorney's fees.

The $90,000 fee which would represent the Pomerantz firm's 15 percent share if the $600,000 fee sought herein were to be awarded would constitute payment to the firm, for its work herein, at the rate of $669.14 per attorney hour—a rather rich rate, whatever criteria are applied.

*Kaufman.* The *Bush* action (74 Civ. 3281), with respect to which the Kaufman firm was counsel to the plaintiff, was commenced on July 30, 1974. By that time five shareholder actions involving Teleprompter had already been filed, in addition to the SEC's injunction action. The *Bush* complaint in considerable measure tracked the original *Lewis* complaint (73 Civ. 3929) filed by Wolf Popper, with some details added. It also borrowed generously from the complaint in the SEC's injunction action (74 Civ. 3003), or from another then pending shareholder action which itself relied on the SEC injunction action (i. e., the *Radzanower* complaint (74 Civ. 3025), filed July 16, 1974, in which Ira Jay Sands represented the plaintiff). The complaint filed by the Kaufman firm differed from the other complaints in the consolidated action in that it included a derivative count.[10] The *Bush*

---

9. The breakdown of Wolf Popper's time between partners and associates is as follows, with the current normal time charges for each indicated:

| Category | Current Normal Hourly Time Charges | Hours Spent | Total Time Charges at Current Normal Hourly Rate |
|---|---|---|---|
| Partners | $175.00 | 637.00 | $111,475 |
| Associates | 95.00 | 1,857.00 | 176,415 |
| Jr. Associate | 50.00 | 42.6 | 2,130 |
| | | 2,536.6 | $290,020 |

10. This derivative count was consolidated herein for pre–trial purposes only, but it is encompassed within the proposed settlement.

complaint differed from most of the other complaints in that it named as a defendant the accounting firm of Touche Ross, which under the settlement will make a payment of $150,000. In this, however, the *Bush* complaint was anticipated by two other complaints.[11]

Stanley L. Kaufman, senior partner of the Kaufman firm, conferred with Mr. Jones of Wolf Popper before he filed the *Bush* complaint. He supported Wolf Popper's application to be named lead counsel. Shortly after consolidation he agreed with Mr. Jones that the Kaufman firm would receive 8½ percent of any fee awarded to Wolf Popper.[12] I find that this fee agreement was directly related to Wolf Popper's application to be lead counsel. The fee agreement was not disclosed to the court at the time it was made, and only became known at the hearing before me in connection with attorney's fee applications.

The Kaufman firm spent 111 hours on the Teleprompter litigation. It argues, in support of the Wolf Popper application and its own 8½% thereof, that the derivative claim which appeared only in the *Bush* complaint may have provided pressure toward settlement.[13] If it were awarded $51,000, which would constitute 8½% of a $600,000 fee award, the Kaufman firm would be compensated upon the basis of $459.45 per attorney hour, a rate considerably richer than the $200 per hour which it posits as its non–contingent billing rate.

### B.

The hearings on attorney's fees also flushed out for consideration Wolf Popper's forwarding fee agreements with two other attorneys, Mr. Abraham I. Markowitz and Mr. Richard D. Greenfield.

*Abraham I. Markowitz.* In the initial affidavit submitted by Mr. Jones in support of the Wolf Popper application for counsel fees herein, Mr. Jones recited that Wolf Popper's client, Harry Lewis, requested that Wolf Popper "investigate the circumstances of the announcement by Teleprompter of the suspension of approximately twenty per cent of Teleprompter's construction program on September 4, 1973." Wolf Popper, according to Mr. Jones, conducted a rapid and thorough investigation, "in view of the apparent urgency in the situation engendered by the fact that, *after our investigation had commenced, the SEC suspended trading in Teleprompter stock on September 7, 1973.*"[14] (Emphasis added.) There was no reference in this original affidavit to Abraham I. Markowitz, or to any role played by Mr. Markowitz.

It develops, however, that Harry Lewis was a client of Mr. Markowitz who retained Mr. Markowitz "to investigate the reasons behind the suspension of trading in Teleprompter stock on September 7, 1973, and in the event [Mr. Markowitz] found any basis for legal action flowing therefrom to commence such litigation." Mr. Lewis authorized Mr. Markowitz to associate with other counsel. Mr. Markowitz investigated, concluded that an action under the Securities Exchange Act was indicated, secured Mr. Lewis' authorization on September 11, 1973 to retain Wolf Popper, and on September 12, 1973 "contacted Philip Jones relative to bringing this action."[15]

---

11. These were the *Independent Investor Protective League* complaint (73 Civ. 4133), filed on September 26, 1973 by Bader and Bader; and the *Radzanower* complaint (74 Civ. 3025), filed July 16, 1974 by Ira Jay Sands.

12. The agreement was that the Kaufman firm would receive 10 percent of the award received by Wolf Popper, net of the 15 percent to be paid to the Pomerantz firm.

13. Since the only defendants contributing to the settlement are Teleprompter and Touche Ross, there is certainly no component of the settlement recovery which can be attributed to

the *Bush* derivative count. While Touche Ross, also named as a defendant in the *Bush* complaint, will contribute to the settlement, its presence as a defendant in the consolidated action cannot be credited to the Kaufman firm, since two previously filed complaints had already introduced Touche Ross as a defendant in the litigation involving Teleprompter. (*See* fn. 11, *supra*).

14. Affidavit of Philip Jones dated January 2, 1979.

15. Affidavit of Abraham I. Markowitz dated May 30, 1979, at 1–2.

Wolf Popper commenced the Lewis action on September 13, 1973. Mr. Markowitz' original fee agreement with Wolf Popper was that he was to receive 20 percent of the net fees received by Wolf Popper if the action were concluded successfully. This agreement was later modified, in light of Mr. Markowitz' "limited involvement in the conduct of the litigation and the amount of work performed by" Wolf Popper, to provide for payment to Mr. Markowitz of 10 percent of the net fees received by Wolf Popper.[16]

Since the amount to be received by Mr. Markowitz was to be computed only on the portion of the fee award to be received by Wolf Popper, and thus not on the portions of the award to be received by the Pomerantz and Kaufman firms he was, in accordance with his agreement with Mr. Jones, to receive 10 percent of 76½ percent of the total amount awarded on the basis of the Wolf Popper application. If the total amount so awarded was $600,000, Mr. Markowitz' share thereof was to be $45,900.[17]

Aside from initiating the investigation of Teleprompter affairs which led to the commencement of the *Lewis* action (73 Civ. 3929), I do not know what, if any, services Mr. Markowitz rendered to the shareholder class. He kept no time records. He apparently acted as intermediary between Wolf Popper and plaintiff Lewis. He had originally discussed with Mr. Jones the findings and analysis he made as a result of his original investigation of the Teleprompter matter and it was agreed between Mr. Markowitz and Mr. Jones that Mr. Markowitz "would participate to such reasonable extent as Mr. Jones might call upon [him] which included [his] continued responsibility to Mr. Lewis."[18]

His major services, once Wolf Popper entered the picture, were, in fact, to himself

and to plaintiff Lewis, rather than to the shareholders as a class. Thus he kept himself and Mr. Lewis advised of the progress of the action, and he discussed "with Mr. Jones questions of consolidation and working arrangements with" Pomerantz and Kaufman.[19] These "questions of consolidation and working arrangements" obviously might have impact upon his own fee arrangements with Wolf Popper since consolidation implied others to share the pie. Their practical impact was that his percentage of the Wolf Popper net fee was reduced from 20 percent to 10 percent.

While Mr. Markowitz asserts that he is an attorney experienced in securities litigation, I do not have information available to me as a basis to make a finding to that effect, and since he has submitted no time records or even time summaries I have no means available to quantify his involvement.

In sum, Mr. Markowitz was promised a specific percentage share in the fee by Mr. Jones, and the court is being asked to put its imprimatur on that promise. Since the sums approved as legal fees to Mr. Markowitz, whether they are awarded directly by the court or pass through Wolf Popper, will be taken from the members of the class in the sense that they will reduce the total amount distributed to the class, I decline to provide such imprimatur.

*Richard D. Greenfield.* Richard D. Greenfield is the attorney for Harry Sigafoos, who intervened as an additional plaintiff in the *Turek* action (73 Civ. 4109). Mr. Greenfield was consulted by Mr. Sigafoos concerning his investment in Teleprompter shares in October, 1973 (after the *Lewis* (73 Civ. 3929) and *Turek* (73 Civ. 4109) actions had already been begun by Wolf Popper, and after the *Independent Investor Protec-*

---

16. *Id.* at 2.

17. The Pomerantz firm would receive 15%, or $90,000. The Kaufman firm would receive 8½%, or $51,000. This would leave 76½%, or $459,000, to go to the Wolf Popper firm, and Mr. Markowitz was to receive 10% of this amount, or $45,900.

18. Markowitz affidavit dated May 30, 1979, at p. 2.

19. *Id.* at p. 3.

*tive League* action (73 Civ. 4133)[20] had been begun by the law firm of Bader & Bader). Mr. Greenfield investigated, obtained various documents from the SEC, concluded that Teleprompter and others had violated the federal securities laws, and proceeded to draft a complaint. He consulted the law firm of David Berger, P. C., and refined his draft complaint as a result thereof. But the complaint never made an appearance in this court. Through David Berger, who was his contact with Mr. Jones of Wolf Popper, it was learned that other actions involving the same subject matter were pending in New York City. Mr. Berger arranged with Mr. Jones that Mr. Sigafoos would intervene in the pending *Turek* action (73 Civ. 4109) as an additional plaintiff. Mr. Jones made substantially the same agreement with Mr. Greenfield (through Mr. Berger) that he made with Mr. Markowitz, and the agreement was thereafter modified to the same extent. Thus he originally agreed that Mr. Berger (or Mr. Greenfield) would receive 20 percent of the net fees received by Wolf Popper, and this was later reduced to 10 percent. Thus Mr. Greenfield would also receive $45,900 if the total fee award as requested by Wolf Popper was approved.

Mr. Greenfield's contributions in the *Turek* action (73 Civ. 4109) and in the consolidated action were that he was in periodic contact with Mr. Jones of Wolf Popper and his associate, Robert Kornreich "with respect to the progress of the litigation. [He] thereafter reported to [his] client based on [his] conversations with Messrs. Jones and Kornreich and the documents that [he] personally reviewed."[21]

Mr. Greenfield expended 72 hours on the Teleprompter matter. His current billable rate for such services is $135 per hour. If he received the anticipated $45,900, he would be compensated on the basis of a per hour rate of $637.50. Granted that the addition of Mr. Sigafoos as a plaintiff in the *Turek* action may have somewhat strengthened the plaintiffs' hand, there is nothing in the record before me which warrants anything in the nature of such a fee with respect to any services rendered by Mr. Greenfield to the shareholder class.

## IV.

■ The foregoing analysis of Wolf Popper's arrangements with parallel plaintiffs' counsel in the consolidated action, and with the attorneys for plaintiffs represented by Wolf Popper in actions now contained in the consolidated action, bespeaks conduct which cannot be condoned. The arrangements reviewed above were made without court sanction, and they might never have come to light if acrimony had not developed between the Wolf Popper, Pomerantz, and Kaufman firms on the one hand and certain other plaintiffs' counsel on the other in the course of the fee application proceedings before me.

■ Moreover, with respect to the Pomerantz and the Kaufman firms, which seek attorney's fees under the umbrella of the Wolf Popper application, their involvement in Teleprompter litigation is on a "tag–along" basis: at the pre–consolidation stage they made no unique contribution to the development of the plaintiffs' case.[22] I see no reason why the shareholder class should be required to pay for such derivative endeavors. Certainly the Pomerantz and Kaufman firms represented different plaintiffs, but those plaintiffs would have been included in the class ultimately to be certified in the original *Lewis* and *Turek* actions filed by Wolf Popper. Absent a lack of confidence in the ability of Wolf Popper to manage a complicated class action litigation

---

**20.** The complaint in 73 Civ. 4133 was filed on September 26, 1973. A motion to dismiss was granted on December 11, 1973 by Judge Thomas P. Griesa, subject to the condition that the plaintiffs were given leave until December 27, 1973 to serve an amended complaint. An amended complaint was in fact filed on January 4, 1974.

**21.** Affidavit of Richard D. Greenfield dated May 18, 1979.

**22.** The same thing is true of those attorneys whose applications are opposed by Wolf Popper (*see* Section V, pp. 24–27, *infra*).

I see no reason why essentially duplicative actions should have been filed. Since at the consolidation hearing the Pomerantz and Kaufman firms urged the appointment of Wolf Popper as lead counsel, they obviously did not lack confidence in Wolf Popper.

It is possible, of course, that more than one law firm could independently have brought actions which were prompted by the Teleprompter activities in 1973. I find that with respect to the Pomerantz firm and the Kaufman firm, this did not happen. An analysis of the various complaints filed in the actions consolidated herein indicates otherwise. Thus the complaint filed by the Pomerantz firm (73 Civ. 4895) was largely based on the original Wolf Popper complaint (73 Civ. 3929); the complaint filed by Kaufman (74 Civ. 3281) was based on the original Wolf Popper complaint and on the SEC complaint (74 Civ. 3003) or the *Radzanower* complaint (74 Civ. 3025) with the addition of a derivative count.[23]

The principle that private attorneys general should be paid for their successful endeavors by fees from the proceeds of those endeavors which are reasonable in light of their own skills, the difficulties of the legal work done, the time that has been devoted to the task, and the contingent nature of their retention is indeed a valid one. There is no bandwagon corollary to that principle, however, and I refuse to burden the class members with fees which will serve only to encourage the "tag along" activities so evident here. To the extent that fees are allowed herein, they recognize the fact that when these actions were consolidated, the plaintiffs represented by tag–along counsel were charged with pro rata responsibility for costs, expenses and disbursements.

■ I have, in fact, given long consideration to denying any attorney's fees to Wolf Popper and the Pomerantz and Kaufman firms on the basis of their blatant disregard of their obligations to the shareholder class and to the court. *See* Opinion and Order of Judge Kevin Duffy dated June 26, 1980 in *In the Matter of Futuronics Corporation*, 79

Civ. 6305 (KTD). I have decided against that course a) because a decided benefit was bestowed on the shareholder class, and b) because, incredibly, it seems never previously to have been drawn to the attention of these experienced plaintiffs' counsel that such activities will not be countenanced. As appears below, however, substantial reductions have been made in the fee awards because of counsels' conduct. I recognize that there have been certain back–scratching traditions among members of the shareholder class action plaintiffs' bar, and that the scrutiny engaged in herein was probably not anticipated. Nothing in the attorney's fee awards which I authorize in this case should be construed as approving those back–scratching practices, or condoning them in the future.

The above considerations lead me to the following disposition of the Wolf Popper application for fees.

■ 1. *Wolf Popper.* I award Wolf Popper $317,200 in fees, plus disbursements of $12,971.72. $367,200 is the total amount which Wolf Popper would have received of the $600,000 attorney's fee which it applied for, if all of its various commitments to others had been observed. Thus this amount presumably represents Wolf Popper's own assessment of a reasonable fee for its legal services in the Teleprompter matter. Without reference to considerations discussed in this opinion, $367,200 would constitute a fair and reasonable fee for the services rendered by Wolf Popper in this matter. I predicate this finding on consideration of the contingent nature of the representation, the problems presented and the difficulties faced, the work done, the abilities of the attorneys involved, and the results accomplished. A fee of $367,200 would reflect a multiple of 1.266, which is certainly reasonable considering the contingent nature of the representation and the length of time which has passed since the services to which the compensation pertains were rendered.

---

**23.** As has already been pointed out, the inclusion of Touche Ross as a defendant in the Kaufman complaint was anticipated in previously filed complaints.

I have reduced the award I would otherwise have authorized to Wolf Popper by $50,000 because I find that its comportment in this matter fell far short of what should be expected, let alone required, of officers of the court. The arrangements delineated above should not in any event have been made—a proper sense of duty to members of the class represented by Wolf Popper and to the court should have precluded them. Proper or improper, those arrangements should have been disclosed on a threshhold basis to the court, and its consent or guidance sought. I am persuaded that they were not disclosed because it was self-evident that they would not withstand judicial scrutiny.

2. *Pomerantz.* I award the Pomerantz firm $11,145, which I have computed in the following wise. The Pomerantz firm spent a total of 134½ hours on the Teleprompter matter. The fee to Wolf Popper (prior to reduction) of $367,200 resulted in a Wolf Popper hourly rate, for 2,536 hours, of $144.79. I have used the same hourly rate for Pomerantz, reduced by ten percent because Wolf Popper, but not Pomerantz, was lead counsel. The reduced hourly rate of $130.31, applied over 134½ hours, indicated a fee to the Pomerantz firm of $17,526.69. I have reduced that indicated fee by 25 percent to $13,145 because of the tag-along nature of the complaint filed by the Pomerantz firm; I have not reduced it further on this ground because I accept at face value Mr. Jones' representation that he consulted with the Pomerantz firm subsequent to consolidation. I have then reduced the $13,145 amount by $2,000 because of the Pomerantz firm's participation in an undisclosed agreement with Wolf Popper to share in the fee award.

3. *Kaufman.* I award the Kaufman firm $8,848.31, which I have arrived at as follows. The Kaufman firm spent a total of 111 hours on the Teleprompter matter, and I have applied to this total the same reduced hourly rate of $130.31 as was involved in the award to the Pomerantz firm, giving a quotient of $14,464.41. I accept the representations of Mr. Jones of Wolf Popper that the Kaufman firm was consulted in the post–consolidation phases of the litigation. I have reduced the $14,464.41 by 25 percent because of the tag–along nature of the complaint brought by the Kaufman firm. I have reduced the resultant $10,848.31 by $2,000 because of the Kaufman firm's role in the undisclosed agreement with Wolf Popper to share the fee award.

4. *Abraham I. Markowitz.* Mr. Markowitz' service to the shareholder class was at the threshhold of the Teleprompter litigation, when he investigated Teleprompter activities, recommended to Harry Lewis that he bring suit, and then retained Wolf Popper to represent Mr. Lewis. Thereafter his services were basically to Mr. Lewis, on whose behalf he kept informed of developments, and to himself, in renegotiating his fee agreement with the Wolf Popper firm in light of the involvement of the Pomerantz and Kaufman firms. Mr. Markowitz has failed to provide any information concerning the time he committed to Teleprompter matters. I award him $5,000, which I find reasonable to compensate him for his only services to the shareholder class, his preliminary investigation and his retention of Wolf Popper to initiate the litigation, all of which took place within a period of some ten days.

5. *Richard D. Greenfield.* I make no award to Mr. Greenfield. His initial investigation into the Teleprompter matter took place only after various other shareholders' complaints had already been filed. His client, Harry Sigafoos, became an additional plaintiff in Wolf Popper's *Turek* action (73 Civ. 4109). Apart from Mr. Jones' assertion that the addition of Mr. Sigafoos as a plaintiff was helpful because he invested in Teleprompter in August, 1973, I discern no basis for a finding that Mr. Greenfield's efforts benefitted the shareholder class.

V.

Applications for award of legal fees have also been filed by the attorneys for the plaintiffs in various other actions consolidated herein. In this connection I note that the order of consolidation required the

plaintiffs in each of the constituent actions to bear a proportionate share of all costs, expenses and disbursements incurred by lead counsel in the consolidated action.[24] It also required lead counsel to give the other plaintiffs' attorneys notice of all depositions and provided that they could attend such depositions and suggest to lead counsel additional questions to be propounded.[25] Lead counsel failed to notify the other plaintiffs' counsel of scheduled depositions, and thus they did not participate in that phase of the litigation.

*Ira Jay Sands.* Mr. Sands filed the *Radzanower* complaint (74 Civ. 3025) on July 16, 1974. By that time four Teleprompter complaints had already been filed,[26] and the SEC injunction action (74 Civ. 3003) had also been filed.

The *Radzanower* complaint borrowed liberally from *Turek* and also from the complaint in the SEC action. It was innovative in that it named as defendants not only Teleprompter and Touche Ross, its accounting firm, but a whole panoply of officers and directors of Teleprompter: the complaints in prior actions had been more sparing in their designations of defendants.[27] The *Radzanower* complaint also named as defendant the First National Bank of Boston.

It is work done by Mr. Sands with respect to this latter defendant that is the principal predicate for the *Radzanower* legal fee application. A motion to dismiss the *Radzanower* complaint as against the bank under Rules 12(b)(2) and (3), Fed.R.Civ.P., was granted by Judge MacMahon on October 21, 1974 on the authority of 12 U.S.C. § 94. Judge MacMahon's order was affirmed by the Court of Appeals on May 23, 1975. The Supreme Court granted certiorari and affirmed. *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976).

Mr. Sands has applied for legal fees of $98,175, increased by some multiple in the discretion of the court, and expenses of $4,893. He argues that the public weal has been served by clarification of the law with respect to the conflict between the venue provisions of the National Bank Act[28] and of the Securities Exchange Act.[29]

However the public weal may have benefitted from Mr. Sands' appellate endeavors, the shareholder class in the consolidated action did not. The First National Bank of Boston was removed as a defendant and stayed removed. All of us may owe Mr. Sands a vote of thanks for the diligent efforts he made to insure that the law with

---

**24.** Order of consolidation filed November 19, 1974, p. 4.

**25.** *Id.*, p. 2.

**26.** *Lewis* (73 Civ. 3929), filed by Wolf Popper, September 13, 1973; *Turek* (73 Civ. 4109), filed by Wolf Popper, September 26, 1973; *Independent Investor Protective League* (73 Civ. 4133), filed by Bader & Bader, September 26, 1973; and *Heller* (73 Civ. 4895), filed by the Pomerantz firm, November 14, 1973.

**27.** The complaints in *Lewis* (73 Civ. 3929) and *Turek* (73 Civ. 4109) had named only Teleprompter as defendant. The complaint in *Independent Investor Protective League* (73 Civ. 4133) had named Teleprompter, Touche Ross, the SEC, three individuals and "John Doe" and "Richard Roe," "the parties intended being those persons, firms, corporations and associations involved in the unlawful acts set forth herein." The *Heller* complaint (73 Civ. 4895) listed as defendants Teleprompter and its president and two directors who were major shareholders.

**28.** 12 U.S.C. § 94 provides that an action against a national banking association may be had in any federal district court within the district in which the association is established:

Actions and proceedings against any association under this chapter may be had in any district or Territorial court of the United States held within the district in which such association may be established, or in any State, county, or municipal court in the county or city in which said association is located having jurisdiction in similar cases.

**29.** Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, provides that: "[a]ny suit or action to enforce any liability or duty created [by or under the Securities Exchange Act] ... may be brought in any such district [wherein any act or transaction constituting the violation occurred] or in the district wherein the defendant is found or is an inhabitant or transacts business ...."

respect to venue over a national bank was clarified, but a shareholder class which did not benefit from those endeavors should not be required to pay for them.

Mr. Sands has not differentiated the time and expenses attributable to his work on the First National Bank of Boston from his work·on other aspects of the *Radzanower* case, and I am not in a position to make this differentiation for him.

■ Mr. Sands did, however, make a major contribution to my consideration of the fee application matter by drawing to my attention various omissions with respect to lead counsel's application for fees which might otherwise have gone unnoticed. Thus he pointed out that the joint fee application by lead counsel was predicated upon undisclosed threshold agreements between the Wolf Popper firm and others to divide the fee to be awarded on pre–determined percentages, which would have had the consequence, if it went unnoticed, that fees would be awarded on bases that were unrelated to services rendered to the plaintiff shareholder class. This was a service to the court and a service to the shareholder class. I find that $15,000 is a reasonable fee for this service, and I award that amount to Mr. Sands.

■ *Samuel Weinstein.* Mr. Weinstein filed the complaint in the *Brill* action (74 Civ. 4341) on October 3, 1974 after the SEC injunction complaint and six of the eight complaints which were ultimately consolidated herein had already been filed in this district. The *Brill* complaint substantially followed either the SEC complaint (74 Civ. 3003) or the shareholder complaints which themselves substantially tracked the SEC complaint, *Radzanower* (74 Civ. 3025), and *Bush* (74 Civ. 3281). It was filed only a month and a half before the order of consolidation was filed. It was strictly a tag–along complaint, and except for the fact that the plaintiff therein was made responsible in the order of consolidation for his

proportionate share of lead counsel's costs, expenses and disbursements, I would not consider any fee award. Mr. Weinstein and his colleagues (Irving Steinman and Frank Weinstein) devoted 63 hours to the Teleprompter litigation, and incurred expenses of $40.52. I find that $1,000 is a reasonable fee for their services, and award them that amount, plus expenses of $40.52.

*Jerrold M. Shapiro.* The *Oliff* complaint (75 Civ. 1815) was filed in the Northern District of Illinois on September 19, 1974. The action was transferred to this district by order entered in the Northern District of Illinois. It was originally a *pro se* action with two of the plaintiffs appearing for themselves and as counsel for a third plaintiff: prior to transfer another attorney, Lowell E. Sachnoff, associated himself with plaintiff Shapiro as attorneys for plaintiff. Six of the other *Teleprompter* complaints had been filed in this district by the time the *Oliff* action had begun, as had the SEC injunction action (74 Civ. 3003). The *Oliff* complaint substantially tracks the SEC complaint. A major part of plaintiff's effort, prior to transfer to this district, was devoted to resisting transfer, and it is difficult to see any benefit to the shareholder class which flowed from that endeavor. Plaintiffs seek $9,210 in legal fees. Mr. Shapiro devoted 96 hours to the Teleprompter matter between August, 1974 and March 31, 1975, and claims that his services deserve compensation at the rate of $85 per hour. Mr. Sachnoff devoted seven hours to the matter, and compensation is requested with respect to him at the rate of $150 per hour.

Absent the requirement in the order of consolidation that requires the plaintiffs in the *Oliff* action [30] to bear their proportionate share of the costs, expenses and disbursements of lead counsel, I would not entertain an application for attorney's fees in the *Oliff* action.

---

**30.** An order was filed on February 23, 1976 directing that the *Oliff* action be consolidated for all purposes with the *Lewis* action (73 Civ. 3929) and that the consolidated class action complaint which had been filed on December 26, 1974 was to be deemed to include or refer to the claims asserted by the plaintiffs in the *Oliff* action.

I shall eliminate from consideration that portion of plaintiffs' counsel's endeavors which I find pertinent to the motion for transfer. As to the balance, which I find constituted 46½ hours of Mr. Shapiro's time and two hours of Mr. Sachnoff's time, I award legal fees of $1,000, which I find to be fair and reasonable in light of the tag–along nature of the complaint.

### VI.

 I. Walton Bader, of Bader & Bader, counsel for the plaintiffs in *Independent Investors Protective League*, 73 Civ. 4133, has objected to the settlement. His objection is predicated upon his assertion that lead counsel did not adequately assess the vulnerability of the defendants, particularly Touche Ross, on the pendent common law counts. He alternatively argues that the state common law counts are not encompassed, or should not be encompassed, within the settlement.

I reject this objection. I find that lead counsel adequately assessed the potentiality of all claims, and the litigation risks associated with all claims, including the common law claims. In determining that the settlement is fair and reasonable I have given full consideration to all claims, state and federal, which will be finally put to rest when the settlement becomes final.

I also find that the common law claims are, and have been, a part of the claims asserted in the consolidated action against the defendants. The settlement negotiated between lead counsel and defendants was a settlement of all claims asserted, or which could have been asserted. Lead counsel has projected, and I find that projection, while an estimate, to be accurate, that defendants' maximum liability if all claims were proven would be $5 million. Defendants have agreed to pay $2,725,000 in settlement of those claims. Of this sum, $150,000 is being paid by Touche Ross. I am persuaded that defendants would not be willing to settle for a sum which is more than 50 percent of the optimum recovery if the settlement did not also encompass the state claims.

Mr. Bader has also objected to the specific provision of the settlement which would bar suit by, *inter alios*, former shareholders on any matters encompassed in the settlement.

Notice of the proposed settlement was given to all members of the plaintiff class, and to all shareholders of Teleprompter. Notice was not given to former shareholders who were not members of the plaintiff class. The judgment which is filed herein will have *res adjudicata* and collateral estoppel effect, and to that extent may well bar suit against the defendants with respect to claims encompassed in this action. It would certainly seem that it would have that effect as to anyone with actual notice of the settlement. However, the specific reference to former shareholders will be deleted from the injunctive provisions of the judgment to be filed herein.

### VII.

A judgment will be submitted by lead counsel which gives effect to the dispositions provided for herein, on two weeks' notice to counsel for all plaintiffs and all defendants.