In re "AGENT ORANGE" PRODUCT LIABILITY LITIGATION.

Michael F. RYAN, et al., Plaintiffs,

v.

DOW CHEMICAL COMPANY, et al., Defendants.

Stephen J. SCHLEGEL, et al., Petitioners,

v.

David J. DEAN, Respondent.

MDL No. 381, 79–C–747, CV–85–2022.

United States District Court,
E.D. New York.

June 27, 1985.

Elihu Inselbuch and Richard B. Schaeffer, Gilbert, Segall and Young, New York City, for respondent-petitioner Majority of the Agent Orange Plaintiffs' Management Committee, consisting of Stephen J. Schlegel, Schlegel & Trafelet, Ltd., Chicago, Ill., Thomas Henderson, Henderson & Goldberg, Pittsburgh, Pa., Phillip E. Brown, Hoberg, Finger, Brown, Cox & Molligan, San Francisco, Cal., Stanley Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, Ohio, John Q. O'Quinn, O'Quinn & Hagans, Houston, Tex., Neil R. Peterson and Gene Locks, Greitzer & Locks, Philadelphia, Pa., Newton B. Schwartz, Houston, Tex., former member Benton Musslewhite, Law Offices of Benton Musslewhite, Inc., Houston, Tex.

Leon Friedman, Hempstead, N.Y., for movant-respondent David J. Dean, Dean, Falanga and Rose, Carle Place, New York.

### MEMORANDUM and ORDER

WEINSTEIN, Chief Judge:

David J. Dean, Esq., a member of the Agent Orange Plaintiffs' Management Committee ("PMC"), has moved to set aside the PMC's agreement to pay certain committee members a 300 percent return of funds they advanced to finance the litigation. The payment would be made out of all the fees awarded to the PMC attorneys by the court. The other PMC members oppose the motion and seek to compel arbitration. For reasons indicated below, Mr. Dean's motion is denied and the petition to compel arbitration is dismissed.

The issues raised by Mr. Dean's motion present new and difficult questions in the financing of major toxic tort litigations. Implicated are the boundaries of legal ethics and the legality of fee arrangements among attorneys in class actions. The instant attorneys' agreement for fee distribution will not be set aside. In any future

case in this district such an agreement must be revealed to the court and members of the class as soon as possible. A "sunshine" rule is essential to protect the interests of the public, the class and the honor of the legal profession.

## I. FACTS

In 1979 cases began to be transferred to this district for consolidation of pretrial proceedings in the Agent Orange multidistrict litigation. In 1980 the court tentatively certified a class and appointed Yannacone and Associates, a consortium of local lawyers, as class attorneys. Yannacone and Associates withdrew as class counsel in September 1983 because of management problems and lack of financing. They were replaced by Stephen J. Schlegel, Benton Musslewhite, and Thomas W. Henderson. Mr. Schlegel and Mr. Henderson are members of the current PMC. Mr. Musslewhite resigned in February 1985 but still considers himself bound by the PMC fee sharing agreement.

David Dean, a member of the original management committee, remained associated with the new committee. At pretrial conferences after October 1983 the court indicated that he would be expected to take the lead in preparing and trying the case. In February 1984 the court at the PMC's request approved an expansion of its membership to include Mr. Dean and other lawyers who previously had been working informally with class counsel.

The class action was settled in May 1984 on the eve of trial. Attorney fee applications were required to be submitted by the end of August 1984. The PMC submitted a joint fee award application. Only then was the court apprised of the existence of an internal management agreement among the PMC lawyers that set out the procedure for allocation of any fees awarded from a class recovery. Its provisions called for (1) a 300% return of funds advanced by certain PMC members before any other distribution, and (2) division of the remainder of the award as follows: 50% in equal shares among all committee members, 30% in proportion to hours worked, and 20% based on factors parallel-

ing those considered by courts in granting fee award multipliers.

After the court voiced serious doubt about the legality and propriety of this arrangement at the September 26, 1984 attorney fee hearing, the PMC members renegotiated their fee-sharing agreement. The new arrangement still requires a threefold reimbursement of monies advanced, but the remainder of the fee awards would be allocated to those who were awarded them by the court. This renegotiated agreement, entered into on December 13, 1984, is retroactive to October 1, 1983. It provides in pertinent part as follows:

> When and if funds are received, either by the AOPMC or individual members thereof, the first priority distribution will be to distribute to Messrs. Brown, Chesley, Henderson, Locks, O'Quinn and Schwartz, an amount equivalent to the actual monies expended for which these six signatories were responsible toward the common advancement of the litigation up to $250,000.00 with a multiplier of three (*i.e.*, none of these six individuals will receive more than $750,000.00 each), which shall be paid to them for having secured the funds for the AOPMC and to Messrs. Dean, Schlegel and Musslewhite an amount equivalent to the actual monies expended by these three signatories toward the common advancement of the litigation up to $50,-000.00 with a multiplier of three (*i.e.*, none of these three signatories will receive more than $150,000.00 each). Any additional expenses will be reimbursed without a multiplier as ordered by the Court.

> All of the expenses plus the appropriate multiplier will be deducted from the total fees and expenses awarded by the Court to all of the AOPMC firms. The remaining fees will then be distributed *pro rata* to each signatory in the proportion the individual's and/or firm's fee award bears to the total fees awarded.

The agreement also provides for mandatory arbitration of "[a]ny dispute concerning

monies due a member [of the PMC] or his rights under this agreement."

Messrs. Brown, Chesley, Locks, O'Quinn and Schwartz each have advanced $250,000. Mr. Henderson has contributed a total of $200,000. The remaining three PMC members have not advanced any funds for general expenses, although they have incurred individual expenses, for which they will be individually reimbursed. *See In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1296 (E.D.N.Y. Jan. 7, 1985, as modified June 18, 1985).

According to Mr. Dean, the agreement will be interpreted to reach the results indicated in the following table taken from his motion papers. The figures given are based on the fees awarded in the January 7, 1985 order rather than the somewhat higher awards ultimately allowed on reconsideration. *See In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1296 (E.D.N.Y. January 7, 1985, as modified June 18, 1985). Nevertheless, the general fee-shifting effect shown by the table remains essentially the same. Those who advanced money would be advantaged over those who gave time and skill to the enterprise.

| | COURT AWARDED FEES | NET FEES UNDER AGREEMENT | GAIN OR LOSS | COURT AWARDED RATE | NET HOURLY RATE |
|---|---|---|---|---|---|
| BROWN | 296,493.75 | 551,157.19 | +254,663.44 | 225.00 | 418.26 |
| CHESLEY | 390,993.75 | 567,476.19 | +176,482.44 | 225.00 | 326.56 |
| HENDERSON | 442,552.50 | 576,358.26 | +133,805.76 | 225.00 | 293.03 |
| LOCKS | 332,268.75 | 562,354.76 | +230,086.01 | 225.00 | 380.81 |
| O'QUINN | 88,305.00 | 515,217.00 | +426,912.00 | 100.00 | 583.45 |
| SCHWARTZ | 29,145.00 | 505,026.34 | +475,881.34 | 100.00 | 1,732.81 |
| DEAN | 1,340,437.50 | 331,346.75 | −1,009,090.75 | 225.00 | 55.62 |
| MUSSLEWHITE | 304,657.50 | 152,535.04 | −152,122.46 | 100.00 | 75.10 |
| SCHLEGEL | 763,678.12 | 231,785.14 | −531,892.99 | 262.50 | 79.67 |

## II. PROCEDURAL POSTURE

By notice of motion dated May 20, 1985, Mr. Dean has asked the court to set aside the PMC's fee-sharing agreement. The jurisdictional predicate for the motion is not stated. A new motion to alter or amend the January 7, 1985 judgment insofar as it concerns the agreement would no longer be timely under Rule 59(e) of the Federal Rules of Civil Procedure. A number of Rule 59(e) motions requesting reconsideration of the January 7, 1985 fee order, including one by Mr. Dean to increase his fee award, were pending when his motion was filed. His present application will be deemed a timely amendment to his original Rule 59(e) motion. Alternatively, Mr. Dean's motion will be treated as an independent action for declaratory judgment. *See* 28 U.S.C. § 2201; Fed.R.Civ.P. 57. Federal question jurisdiction would exist. *See infra* Part III. Diversity of citizenship, though unneeded, is present as well.

The other PMC members have opposed Mr. Dean's motion and seek arbitration of the issues raised. They have submitted an independent petition to compel arbitration or, in the alternative, a motion for a stay of proceedings pending arbitration, pursuant to the Federal Arbitration Act. *See* 9 U.S.C. §§ 3, 4. Both applications will be decided in this memorandum and order, which will supersede the unpublished January 7, 1985 memorandum of this court insofar as the latter referred to the PMC's fee-sharing agreement.

## III. LAW ON REVIEW OF FEE-SHARING AGREEMENTS

Under Rule 23(e) of the Federal Rules of Civil Procedure, the court has an obligation to protect the rights of class members. That duty requires review of the reasonableness of an internal fee-sharing agreement to ensure that it does not pose a danger of harm to the class. The court also has supervisory authority over

attorneys who practice before it and thus an obligation to prevent breaches of professional ethics. *See, e.g., In re Corn Derivatives Antitrust Litigation,* 748 F.2d 157, 160, 166 (3d Cir.1984) (federal court has inherent power to discipline attorneys practicing before it); *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1114 (3d Cir.1979) (court has authority to review and set aside contingent fee contracts under Rule 23(e) and its supervisory power); *Prandini v. National Tea Co.,* 557 F.2d 1015, 1019 (3d Cir.1977) (applying bar association disciplinary rules to fee allocation agreement); *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1099 (2d Cir.1977) (noting court's obligation to class members when determining the amount of fee award); Developments in the Law—Class Actions, 89 Harv.L.Rev. 1318, 1607 (1976).

■ Rule 23(e) and the common fund doctrine require a court to fix reasonable attorney fees when a settlement fund has been created in a class action. Under the "lodestar" formula prevailing in this and other circuits, the "touchstone for the fee [is] to be the actual effort made by the attorney to benefit the class." *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1099 (2d Cir.1977). *See, e.g., In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1296 (E.D.N.Y. Jan. 7, 1985, as modified June 18, 1985) (containing an extensive discussion). When an attorney has performed services for the class but is allocated a portion of the fee award by an agreement among attorneys in an amount far different from the value of the services rendered to the class, the court must review the allocation to protect the rights of the class. Whether the total fee award amount is affected by the allocation is not decisive. *See, e.g., Lewis v. Teleprompter Corp.,* 88 F.R.D. 11, 16–24 (S.D.N.Y.1980); *cf. Housler v. First National Bank,* 524 F.Supp. 1063, 1065–66 (E.D.N.Y.1981) (ignoring fee sharing arrangement not brought to court's attention at outset of agreement).

In a number of instances, courts have permitted class counsel to decide how a court-awarded fee should be allocated among them. *See In re Magic Marker*

*Securities Litigation,* [1979–1980] Fed.Sec. L.Rep. (CCH) ¶ 97,116 at 96,195 (E.D.Pa. 1979) (approving joint fee application); *Valente v. Pepsico, Inc.,* [1979] Fed.Sec.L. Rep. (CCH) ¶ 96,921 at 95,863 (D.Del.1979); *Del Noce v. Delyar Corp.,* 457 F.Supp. 1051, 1055 (S.D.N.Y.1978) ("private arrangement as if they were law partners, or joint venturers"); *In re Ampicillin Antitrust Litigation,* 81 F.R.D. 395, 400 (D.D. C.1978) ("Court will defer to the attorney's request that the fee award be made to the Committee of Counsel as a whole, and will not inquire further into the agreement among the attorneys"). None of these cases, however, holds that a court has no power to review an internal fee allocation agreement or that it has no duty to do so when circumstances call for such an inquiry. An attitude of "judicial indifference to attorney fee sharing arrangements," whatever its propriety under ordinary circumstances, is "inappropriate here where another interest of general concern is implicated." *Kamens v. Horizon Corp.,* [1981] Fed.Sec.L.Rep. (CCH) ¶ 98,007 at 91,218 n. 4 (S.D.N.Y.1981).

Federal law governs the exercise of Rule 23(e) responsibilities and the court's inherent supervisory authority. *See Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1110 n. 8 (3d Cir.1979). Principles of professional ethics provide useful guidance to the courts in administering Rule 23(e) and in exercising their supervisory power since federal law has not developed comprehensive standards to govern the conduct of attorneys. In light of the value of uniformity in regulating the bar, federal courts look to the ABA Code of Professional Responsibility and the recently promulgated ABA Model Rules of Professional Conduct. *See In re Corn Derivatives Antitrust Litigation,* 748 F.2d 157, 160–61 (3d Cir.1984); Code DR 2–107, 5–103; Model Rule 1.5, 1.8.

The Code has been enacted in nearly every state. The Model Rules, approved by the ABA in 1983, have been adopted by Arizona, New Jersey, and the United States Claims Court and Tax Court. They are under consideration in a number of

other states including New York. *See* ABA/BNA Lawyers' Manual on Professional Conduct 613–14, 792 (current supp.).

Under Rule 23(e) these ethical principles are not dispositive. The focus of Rule 23(e) is prevention of harm to the rights of the class, a consideration that is independent of, albeit usually consistent with, the Code and Model Rule standards. In addition, general professional ethics guidelines may require interpretation in the class action setting because of the special problems posed by this kind of litigation. As Judge Adams recently observed:

> Perhaps no area of the law provokes as much litigation concerning ethical issues as class actions.... Moreover, the Code of Professional Responsibility, Model Rules of Professional Conduct, as well as bar association opinions provide little guidance to the class action practitioner.... Courts confronting an ethical problem in the class action setting must focus on two points. First, courts cannot mechanically transpose to class actions the rules developed in the traditional lawyer-client setting context; and second, a resolution of such issues would appear to call for a balancing process that in most cases should be undertaken initially by the district court.

*In re Corn Derivatives Antitrust Litigation*, 748 F.2d 157, 163 (3d Cir.1984) (Adams, J., concurring) (citations omitted). Thus a careful analysis must be undertaken with particular attention to the problems and policies of class litigation.

## IV. PETITION TO COMPEL ARBITRATION

The petition for an order compelling arbitration is largely mooted, given the decision on the merits of Mr. Dean's application. Nevertheless, the question of whether this dispute must be referred to arbitration is an antecedent issue that must be addressed before the merits are reached.

The parties disagree about whether the scope of the fee-sharing agreement's arbitration clause is broad enough to cover the issues raised. The provision by its terms requires arbitration of disputes "concerning monies due a member or his rights under this agreement." The scope of this "clause, like any contract provision, is a question of intent of the parties." *S.A. Mineracao da Trindade-Samitri v. Utah International, Inc.*, 745 F.2d 190, 193 (2d Cir.1984). "The federal policy favoring arbitration requires [a court] to construe arbitration clauses as broadly as possible." *Id.* at 194. Doubts about arbitrability "should be 'resolved in favor of coverage.'" *Wire Service Guild v. United Press International*, 623 F.2d 257, 260 (2d Cir.1980) (quoting *International Association of Machinists and Aerospace Workers, AFL–CIO v. General Electric Co.*, 406 F.2d 1046, 1048 (2d Cir.1969)).

Intent of the parties here is unclear. The questions before the court concern amounts payable to PMC members or their contractual rights only in the strained sense that resolution of these issues will determine whether the PMC can allocate fees in accordance with the agreement. Arguably the arbitration provision does not cover such issues. A decision on the scope of the arbitration clause is not required because the issues presented by Mr. Dean's motion are not arbitrable, whether or not the clause purports to cover them.

The general federal policy favoring arbitration must be balanced against the equally significant policies favoring judicial determination of questions about the propriety of professional conduct under Rule 23(e) and the court's supervisory obligations. "In such a situation, generalities must give way to careful analysis of the different, sometimes competing, public policy interests." *Allegaert v. Perot*, 548 F.2d 432, 438 (2d Cir.) (certain bankruptcy issues not arbitrable), *cert. denied*, 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1084 (1977). *See also, e.g., Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953) (claims under Securities Act of 1933 not arbitrable) (cited with approval in *Dean Witter Reynolds, Inc. v. Byrd*, —— U.S. ——, 105 S.Ct. 1238, 1240 n. 1, 84 L.Ed.2d 158 (1985)); *Smoky Greenhaw Cotton Co., Inc. v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 720 F.2d 1446, 1448 (5th Cir.1983) (claims under Securities Exchange Act of 1934 not arbi-

trable); *N.V. Maatschappij Voor Industriele Waarden v. A.O. Smith Corp.*, 532 F.2d 874, 876 (2d Cir.1976) (antitrust and patent invalidity issues not arbitrable); *American Safety Equipment Corp. v. J.P. Maguire & Co., Inc.*, 391 F.2d 821, 825–28 (2d Cir.1968) (antitrust issues not arbitrable); *S.A. Mineracao da Trindade-Samitri v. Utah International Inc.*, 576 F.Supp. 566, 574–75 (S.D.N.Y.) (RICO claims not arbitrable), *order certified for interlocutory appeal*, 579 F.Supp. 1049 (S.D.N.Y.), *appealed on other grounds and affirmed*, 745 F.2d 190, 196–97 (2d Cir.1984).

 The legality of the fee allocation agreement under Rule 23(e) and the supervisory power of the court in ethical matters involving the bar is not an issue that the court can abandon to arbitrators. The "public interest in the dispute" is too great. *Allegaert*, 548 F.2d at 436. To allow an arbitrator to decide the questions here involved—questions that can be raised by the court *sua sponte* or by any class member—would be an abdication of responsibilities to the class and public that the law requires the court to discharge. Lawyers cannot limit the court's legal powers and duties by agreement among themselves. The issues of the legality and propriety of the fee-sharing arrangement "raised here are inappropriate for arbitration." *American Safety Equipment Corp.*, 391 F.2d at 828.

## V. VALIDITY OF THE PMC FEE–SHARING AGREEMENT

Under the terms of the renegotiated agreement now before the court, each PMC member who advanced money for general expenses of the group as distinguished from individual expenses would receive three times the amount advanced, the multiplied amount being paid out of the individual fee and expense allowances of the individual members and the expense allowance of the PMC. The question to be decided is whether this fee allocation must be stricken either as a violation of professional ethics or as a threat to the rights of the class.

The PMC fee-sharing agreement raises two potential problems of professional ethics: inappropriate division of fees between lawyers who are not members of the same firm, and acquisition of a financial interest in the litigation. Ethical prohibitions in either respect are inapplicable here. In addition, no danger to the rights of the class is present under the circumstances of this case. Other considerations render undesirable a mechanical rule against fee-sharing agreements of this kind in all cases.

### A. *Division of Fees*

The ABA Code of Professional Responsibility prohibits a lawyer from dividing a legal fee with another lawyer who is not in the same law firm, unless (1) the client consents to the arrangement, (2) the "division is made in proportion to the services performed and responsibility assumed by each," and (3) the total fee is reasonable. Code DR 2–107(A). The Model Rules of Professional Conduct adopted by the ABA in 1983 contain a more liberal provision. It allows lawyers not in the same firm to divide a fee if (1) either "the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation," (2) the client does not object to any lawyer's participation, and (3) the total fee is reasonable. Model Rule 1.5(e).

Neither provision necessarily restricts the freedom of the PMC to allocate fees among committee members. The PMC may be considered an *ad hoc* law firm, a joint venture formed for the purpose of prosecuting the Agent Orange multidistrict litigation.

Business realities of law practice often require that those who bring clients and capital to a law firm be better compensated than those whose talents lie in the area of preparing legal papers and arguments. *See generally* M. Altman & R. Weil, How to Manage Your Law Office ch. 5 (1984); Law Office Economics and Management Manual §§ 2, 15, 27 (1984). Rainmakers are usually better rewarded than those who labor in the back room. Given the state of the case when Yannacone and Associates found itself without funds to con-

tinue, it was clear when the PMC was organized that money was a more sought after commodity than talent.

■ Viewed from this perspective, the Code and Model Rule restrictions on splitting fees among lawyers of different firms do not control this joint venture. *Cf.* D.C.Bar Comm. on Legal Ethics Op. 151 (April 16, 1985) (DR 2–107(A) permits lawyer who is of counsel to a firm to split fee between lawyer and firm if the of-counsel relationship is akin to that of lawyers in a law firm), *summarized in* ABA/BNA Lawyers' Manual on Professional Conduct 766 (current supp.); N.Y. City Bar Ass'n Comm. on Professional and Judicial Ethics Op. 82–66 (March 29, 1985) (DR 2–107(A) permits attorney admitted in another state who is in firm to share fees with the firm, whether or not attorney works in New York or out-of-state office), *summarized in* ABA/BNA Lawyers' Manual on Professional Conduct 745–46 (current supp.); *In re Corn Derivatives Antitrust Litigation,* 748 F.2d 157, 163 (3d Cir.1984) (Adams, J., concurring) (general principles of professional ethics cannot be applied blindly in class action setting).

The Model Rule provision clearly reflects an increased recognition of the business realities of the legal profession. As the commentary notes, "[a] division of fee facilitates association of more than one lawyer in a matter in which neither alone could serve the client as well...." Model Rule 1.5(e) comment.

The PMC agreement meets the Rule's requirements. First, each PMC member assumed joint responsibility for prosecution of the class action, and that assumption of responsibility was approved by the court on behalf of the class. *Cf.* ABA Comm. on Ethics and Professional Responsibility Informal Op. 85–1514 (April 27, 1985) (Model Rule 1.5(e) requires assumption of responsibility comparable to that of a partner in a law firm under similar circumstances, including financial and ethical responsibility and responsibility for adequacy of representation and client communication), *summarized in* ABA/BNA Lawyers' Manual on Professional Conduct 766–67 (current

supp.). Second, the total fee allowed by the court is reasonable by definition.

No ethical violation can be found here on the basis of inappropriate division of fees among lawyers not in the same firm. Nevertheless, the provisions of Model Rule 1.5(e) and Code DR 2–107(A) on disapproval by the client of any fee splitting arrangement suggest that the class—and the court as the protector of the class—has a continuing interest in being informed of any special fee arrangement as soon as possible.

### B. *Acquisition of Interest in Litigation*

The ABA Code of Professional Responsibility prohibits a lawyer from acquiring a proprietary interest in a case except by a lien for fees or a contingent fee agreement. Code DR 5–103(A). An attorney may advance or guarantee the expenses of a litigation only if the client remains ultimately liable for payment. *Id.* 5–103(B). This latter provision has been held applicable to class actions, notwithstanding that it presents a formidable obstacle to the practical ability of counsel to prosecute class litigation. *See, e.g., In re Mid-Atlantic Toyota Antitrust Litigation,* 93 F.R.D. 485 (D.Md.1982) (denying class certification because arrangement between named plaintiffs and counsel violated DR 5–103(B)); Birmingham Bar Ass'n Op. 22 (May 13, 1983) (DR 5–103(B) prohibits contingent expense agreement in class actions), *summarized in* ABA/BNA Lawyers' Manual on Professional Conduct 801:1104 (1984); Va. Bar Ass'n Informal Op. 485 (Sept. 8, 1983) (same), *summarized in* ABA/BNA Lawyers' Manual on Professional Conduct 801:8813 (1984). *But cf. In re Corn Derivatives Antitrust Litigation,* 748 F.2d 157, 163 (3d Cir.1984) (Adams, J., concurring) (general principles of professional ethics cannot be applied blindly in class action setting); Code Canon 2 ("A Lawyer Should Assist the Legal Profession in Fulfilling Its Duty to Make Legal Counsel Available").

The Model Rules of Professional Conduct carry forward the prohibition on acquisition of a financial interest in a case. *See* Model Rule 1.8. The Rule, however, does allow a lawyer to "advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter." *Id.* 1.8(e)(1).

The PMC agreement goes beyond the simple contingent reimbursement of expenses. It contemplates the return of a profit on the funds advanced. But the profit on the investment is to be paid out of the pooled fee award, not the settlement fund. No independent interest is acquired in the litigation by the investors. Nevertheless, to the extent that the PMC agreement creates a possible conflict of interest, it might be characterized as involving an acquisition of proprietary interest that falls within the prohibitions of the Code and Model Rules. *Cf.* Code Canon 9 ("A Lawyer Should Avoid Even the Appearance of Professional Impropriety") (omitted from Model Rules).

The circumstances of this complex and unique class action require a more sophisticated analysis than would be appropriate in the kind of simple two-party case that furnishes the model for much of the relevant ethical guides. *See In re Corn Derivatives Antitrust Litigation*, 748 F.2d 157, 163 (3d Cir.1984) (Adams, J., concurring). The prohibition on acquisition of a proprietary interest in a litigation has its basis in common law concepts of champerty and maintenance. It is a prophylactic rule intended to prevent conflicts of interest between lawyer and client that could interfere with the lawyer's exercise of free judgment on behalf of the client. Code EC 5–3; Model Rule 1.8 comment. Similarly, the fundamental concern in the instant case is protection of the rights of the class, in part through minimization of potentially detrimental conflicts of interest. But it is also important to avoid creation of disincentives that in individual instances may unnecessarily discourage counsel from undertaking the expensive and protracted complex multiparty litigation often needed to vindicate the rights of a class. An ironclad requirement that class representatives remain ultimately liable for expenses incurred, for example, would prevent many meritorious cases from reaching the courts.

As more fully discussed below, a simple prohibition on advances of cash for expenses does not adequately balance these competing considerations. Moreover, because of the court's responsibility for approval of a class action settlement, it is not the only feasible alternative. A case-by-case examination is not only practical, but advances the important policies favoring class litigation in many instances.

### C. *Protection of the Rights of the Class*

Under Rule 23(e) and the common fund doctrine, when a monetary settlement is reached in a class action federal courts are responsible for assessing attorney fees that are reasonable. Fee awards must reflect the actual work that benefited the class. The court's responsibility for controlling attorney fees arises from the need to safeguard the interests of the class. *See, e.g., In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1296, 1304–1305 (E.D.N.Y. Jan. 7, 1985, as modified June 18, 1985).

When lawyers in a class action agree on an allocation of their fees *inter se* that diverges from the allocation determined by the court, the court must review the reasons for and effect of that allocation to ensure that it has not had and will not have an impact adverse to the interests of the class. *See, e.g., Lewis v. Teleprompter Corp.*, 88 F.R.D. 11 (S.D.N.Y.1980). What are the dangers of a fee-splitting agreement such as that of the PMC?

Most important, an agreement of this kind may create an incentive toward early settlement that may not be in the interests of the class. An attorney who is promised a multiple of funds advanced will receive the same return whether the case is settled today or five years from now. An early settlement will maximize the investor's profit, because he or she then can reinvest the funds elsewhere immediately. A law-

yer in this situation might not negotiate as hard or might decide to settle early, when holding out for a higher settlement or going to trial would be in the best interests of the class. *See generally* Coffee, The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation, Law & Contemp. Probs., Summer 1985, at 5.

The court's responsibility under Rule 23(e) for approval of a class action settlement limits to some extent the effect of this potential incentive for premature settlement. Before approving a class action settlement, a court must find it fair, reasonable and adequate, based on a detailed analysis of the law and facts. *See, e.g., In re "Agent Orange" Product Liability Litigation,* 597 F.Supp. 740, 758–63 (E.D.N.Y.1984). The court, however, cannot make a precise determination of the fairness of the settlement; its task is to decide whether the agreed upon settlement falls within "the range of reasonableness." *Id.,* 597 F.Supp. at 762. Thus the court's approval process may not completely eliminate the more subtle effects of undue pressure on attorneys toward settlement.

In some cases any incentive to settle early will be counteracted by the incentive to prolong litigation created by the "lodestar" method of fee calculation. The lodestar formula rewards counsel based on the number of hours reasonably spent on a case and permits a court to award risk-of-litigation and quality-of-representation multipliers for time spent (but not expense incurred). It thus encourages attorneys to seek higher fees by delaying settlement and spending more time on a case. *See In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1296, 1305–1306 (E.D.N.Y. Jan. 7, 1985, as modified June 18, 1985).

In the instant case, the theoretical incentive to settle early appears not to have been an appreciable factor in inducing settlement. It is clear that the class action settlement was neither premature nor ill-considered, being in the best interests of the class. *Compare In re "Agent Orange" Product Liability Litigation,* 597 F.Supp. 740 (E.D.N.Y.1984) (fairness of proposed settlement) *with id.,* 611 F.Supp. 1223 (E.D.N.Y.1985) (granting summary judgment in the cases of veterans who opted out of the class action). Based on the court's direct observation of counsel, the litigation and settlement negotiations, there is no reason to believe that the existence of the PMC's fee-sharing agreement had any appreciable untoward effect on the decision to settle. Moreover, any incentive to settle would have been counteracted by the lodestar-created incentive to prolong litigation. Here, all nine PMC members worked on the case; only three invested funds without expending extensive productive hours on behalf of the class.

A number of other considerations, though not dispositive, favor giving effect to the PMC's fee-splitting agreement. First, it results in no greater expense than the class otherwise would have borne. The profit will be paid by those members of the PMC who did the work.

Second, law is a business and within limits of public policy such as those set by professional ethics and the usury laws, lawyers may make their own business arrangements as do other business people. No usury is involved *inter se* in this joint venture; the funds advanced were investments, not loans that had to be repaid. A court is not in a good position to review this kind of consensual fee allocation. It lacks detailed knowledge about how lawyers usually structure business relationships among themselves.

Third, there is great doubt that the money to fund the litigation could have been obtained on more favorable terms. A similar arrangement with nonlawyer investors probably would have violated professional ethics. *See* Code DR 3–102(A) (lawyer shall not share fees with nonlawyer); Model Rule 5.4(a) (same); San Francisco Bar Ass'n Legal Ethics Comm. Op. 1981–1 (Nov. 29, 1981) (prohibiting contingent reimbursement arrangement with nonlawyer lender), *summarized in* ABA/BNA Lawyers' Manual on Professional Conduct 801:1851 (1984). Here financing was by

lawyers expected to lend their professional skills as well as advance their money. In the absence of adequate financing, the case might well have collapsed, and neither the class nor the attorneys who worked on their behalf would have received anything.

Fourth, a significant profit could have been earned by investing the funds conventionally. This factor must be considered in evaluating the reasonableness of the three-fold return promised here. In December 1983 the PMC attorneys entered into their original fee-sharing agreement, retroactive to October 1983. It called for a substantial advance from each PMC member except Messrs. Dean, Schlegel and Musslewhite. Interest rates for conventional investments were then high. The length of time that the Agent Orange case would take to litigate and its outcome both were uncertain. The investing attorneys could have reasonably expected to receive a significant return on their capital through reasonably safe alternative investments—perhaps 50 to 100 percent—over the same time period that their money was to be invested in the Agent Orange litigation. Thus at the time that the attorneys committed themselves to making these advances, the expected extra "profit" was significantly less than the agreed upon total interest of 200 percent, being perhaps 100 to 150 percent above the interest they otherwise probably could have earned in less risky enterprises.

Finally, it should be noted that, had the PMC received the roughly $30 million in fees and expenses that it sought in its original fee application, the extra profit to the money suppliers would not have given them an appreciable relative advantage over those who did most of the legal work.

The parties agree that the original agreement was made freely, without duress or coercion. No PMC member protested when the agreement was renegotiated. All else being equal, these factors suggest giving "deference to the parties' contractual agreements" if possible. *Dunn v. H.K. Porter Co., Inc.*, 602 F.2d 1105, 1111 (3d Cir.1979). *See also In re Ampicillin Antitrust Litigation*, 81 F.R.D. 395, 400 (D.D.C.1978).

The practical need for financing in complex litigation renders undesirable an iron-clad rule prohibiting such agreements in all cases on the basis of a potential for harmful conflict of interest. If arrangements of this kind were banned outright attorneys might be dissuaded from financing risky but meritorious class litigation in the future. A case-by-case examination of such fee-sharing agreements best balances this potential chilling effect against the need to safeguard the interests of the class and professional values.

Different arrangements may call for different treatment. The agreement now before the court, for example, differs from that originally entered into by the PMC attorneys. The original agreement provided for a *pro rata* sharing of 50 percent of the amount of pooled fees remaining after the investing lawyers were paid their three-fold return. Such an arrangement not only further distorts the court allocation of fees; it also tends to reward a lawyer who puts in neither funding nor substantial productive efforts. Whether a flat rule against provisions of this kind would be appropriate need not be decided here.

## VI. EARLY FEE DISCLOSURE RULE IN FUTURE CASES

The most troubling aspect of the agreement before the court is the failure of the PMC to reveal its existence until very late in the litigation. Because class attorneys have special fiduciary obligations to the class, and because the court has a responsibility to protect the rights of the class, the class and the court have a right to know about any agreements among counsel for allocating fees payable from a class recovery. In view of the lack of a personal relationship between most class members and the attorneys representing them it is essential that this information be available through the court. Class actions are public or quasi-public in nature. Rule 23 of the Federal Rules of Civil Procedure serves in many respects as a "sunshine" law in its requirements of notice to the class and public hearings. The public and press

must have full access to information about this kind of fee-sharing arrangement so that an opportunity is afforded for comment and objection.

■ In future cases, *as soon as a fee-sharing arrangement is made its existence must be made known to the court,* and through the court to the class. Subsequent modifications if any also must be reported promptly to the court.

Whether the expense of a separate notification to members of the class is warranted will be a matter for the court to consider in connection with each case's needs. Here the size of the class would have made a separate notification inappropriate. The press, however, could have been counted on to spread the word so that interested leaders of the bar and veterans community might have been informed. When notice was ultimately given to the class the fee arrangement notification could have been incorporated in the communication to the class. *See* S.D.N.Y. & E.D.N.Y.Civ.R. 5(a).

A rule requiring early disclosure will have a number of advantages. First, the court at the outset can determine whether to permit the fee allocation agreement to stand before any attorney invests substantial time and funds. Post hoc second-guessing, detriment to individual lawyers and acrimony among counsel will be avoided. *Cf. DiFilippo v. Morizio,* 759 F.2d 231, 234 (2d Cir.1985) (decision about merits of case for calculation of fee award must be *ex ante* determination, not based on hindsight afforded by ultimate result).

■ Second, information on internal financial arrangements will help the court make an informed decision about which lawyers should be permitted to manage the litigation and about whether and under what conditions a class should be certified. Courts have the power to appoint and replace class counsel. *See, e.g.,* Fed.R.Civ.P. 23(d)(3); *Cullen v. New York State Civil Service Commission,* 435 F.Supp. 546, 563–64 (E.D.N.Y.), *appeal dismissed,* 566 F.2d 846, 848–49 (2d Cir.1977); *Percodani v. Riker-Maxson Corp.,* 51 F.R.D. 263 (S.D.N.Y.1970), *aff'd sub nom. Farber v. Riker-Maxson Corp.,* 442 F.2d 457 (2d Cir.1971).

*Cf., e.g., Vincent v. Hughes Air West, Inc.,* 557 F.2d 759, 774 (9th Cir.1977) (upholding court's power to appoint lead counsel in nonclass action setting); *In re Air Crash Disaster at Florida Everglades on December 29, 1972,* 549 F.2d 1006, 1012 & n. 8, 1014–15 (5th Cir.1977) (same); *MacAlister v. Guterma,* 263 F.2d 65, 68–69 (2d Cir. 1958) (same). A court might well base a decision about which attorneys will best represent the class in part on the lawyers' fee allocation arrangements.

When a case can proceed as a class action only if financial agreements of the kind adopted by the PMC are made, the court may deem this a factor to be weighed against class certification. *Cf.* Fed.R. Civ.P. 23(a)(4). Alternatively, class members might choose to decline representation by class counsel under such conditions by opting out of the class action and proceeding individually or as a separate subclass. *See* Fed.R.Civ.P. 23(d).

The court when informed of the fee allocation arrangement could require that it be restructured to minimize inappropriate incentives. *See id.* For example, an agreement for a multiplied repayment of funds advanced might be modified to provide instead for an annual rate of return, with a maximum total return. Such an arrangement would tend to decrease the investing attorney's improper incentive to settle early. At the same time it would provide a cap on the total repayment to minimize the noninvesting attorney's incentive to settle to avoid an obligation to pay cumulative annual interest that might become onerous in a lengthy litigation.

A reporting requirement could be separately imposed by court order at the beginning of each litigation. *See, e.g., In re Equity Funding Corp. of America Securities Litigation,* 438 F.Supp. 1303, 1323 (C.D.Cal.1977); Manual for Complex Litigation § 1.47, Sample Order (alternative 2) ¶¶ 4, 5 (5th ed. 1982). A fixed rule requiring disclosure in every class action, however, is more desirable than issuance of an order in each case. *See Lewis v. Teleprompter Corp.,* 88 F.R.D. 11, 17 (S.D.N.

Y.1980) (objecting to fee agreements "concealed from the court and not disclosed until consideration of the application for fee awards was well under way").

For the reasons explicated above, power to interpret Rule 23 entails by implication the responsibility of a trial court to establish a decisional rule demanding early revelation of fee-sharing arrangements to aid in carrying out responsibilities under Rule 23. The Advisory Committee on Civil Rules of the Judicial Conference of the United States may wish to consider amending Rule 23 to incorporate an explicit disclosure requirement in order to forewarn class attorneys.

The local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York already require disclosure of attorney fee allocation agreements in class actions when notice of fee applications is given to the class:

> Fees for attorneys or others shall not be paid upon the recovery or compromise in a derivative or class action on behalf of a corporation or class except as allowed by the court after a hearing upon such notice as the court may direct. The notice shall include a statement of the names and addresses of the applicants for such fees and the amounts requested respectively and *shall disclose any fee sharing agreements with anyone.* The court, in its discretion, may direct that the notice also be given the New York Regional Office of the Securities and Exchange Commission. Where the court directs notice of a hearing upon a proposed voluntary dismissal or settlement of a derivative or class action, the above information as to the applications shall be included in the notice.

S.D.N.Y. & E.D.N.Y.Civ.R. 5(a) (emphasis added). This Rule 5(a) notice is given late in the litigation, after settlement or other disposition.

The fee application notice requirements of Local Rule 5(a) were waived in this class action "because of the need for continued intensive work by the attorneys until the close of the fairness hearings and because of the complexity of the fee applications."

Notice of Proposed Settlement of Class Action, p. 7, *reprinted in In re "Agent Orange" Product Liability Litigation,* 597 F.Supp. 740, 869 (E.D.N.Y.1984). At the time the court allowed this waiver it was unaware of the existence of the PMC's fee-sharing arrangement.

Disclosure of a fee-sharing agreement at the beginning of every class action is preferable to disclosure after settlement on application for attorney fees. Based on the Agent Orange PMC agreement problems, the Board of Judges of the United States District Court for the Eastern District of New York has unanimously agreed at one of its regular monthly meetings that Local Rule 5 should be modified to require early notice. This amendment will minimize fee-sharing problems in future litigations.

Appropriate steps in amending Local Rule 5 will be taken, preferably in concert with the United States District Court for the Southern District of New York, so that the uniformity of the joint Southern-Eastern District local rules is preserved. Regardless of any amendment to Local Rule 5, in the future full disclosure of fee-sharing arrangements will be required at the outset in any class action filed in this district. Any modification in such arrangements must be promptly brought to the court's attention.

## VII. CONCLUSION

The petition to compel arbitration is dismissed. The motion to set aside the PMC's fee-sharing agreement as renegotiated is denied. The Clerk of the Court is directed to forward copies of this memorandum and order to the parties. No costs or disbursements are granted.

SO ORDERED.